Slip Op. 07-143

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TECHSNABEXPORT,<br><br>   Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br>   and<br><br>USEC Inc. and United States<br>Enrichment Corporation,<br><br>   Defendant-Intervenors. | BEFORE: Pogue, Judge<br>Cons. Court No. 06-00228 |

[Commerce's determination **remanded**]

Decided: September 26, 2007

<u>Pillsbury Winthrop Shaw Pittman LLP</u> (Nancy A. Fischer, Joshua D. Fitzhugh, Christine J. Sohar, Kemba T. Eneas, and Stephan E. Becker) for Plaintiff Ad Hoc Utilities Group.

<u>White & Case, LLP</u> (Adams Lee, Carolyn B. Lamm, Joanna Ritcey-Donohue, Kristina Zissis) for Plaintiff Techsnabexport.

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>Stephen Tosini</u>, Trial Attorney) for Defendant.

<u>Steptoe & Johnson LLP</u> (Eric C. Emerson, Alexandra E. Baj, Evangeline D. Keenan, Richard O. Cunningham, Sohini Chatterjee, Thomas J. Trendl, Wentong Zheng) for Defendant-Intervenors.

**OPINION**

**Pogue, Judge:** These consolidated actions, which are part of a long

line of uranium cases, arise from a decision made by the Department of Commerce ("Commerce" or "the government") to include sales of uranium enrichment services in an antidumping investigation. Plaintiffs Techsnabexport ("Tenex") and Ad Hoc Utilities Group ("AHUG")[1] (collectively "Plaintiffs") challenge the final results (or "determination") in the second five-year sunset review ("the Review") of the suspended antidumping duty investigation of uranium from Russia. <u>Uranium from the Russian Federation</u>, 71 Fed. Reg. 32,517 (Dep't Commerce June 6, 2006)(final results of five-year sunset review of suspended antidumping duty investigation)("<u>Final Results</u>") and the accompanying Issues and Decision Memorandum ("<u>Decision Mem.</u>").

Plaintiffs claim that Commerce's inclusion of  and reliance upon service transactions for uranium enrichment renders unlawful its findings and conclusions with regard to the products subject to investigation, or scope of the proceeding, the volume of subject imports, the likelihood of dumping, and the magnitude of the margin likely to prevail.

Pursuant to USCIT R. 56.2, Plaintiffs move for judgment on the agency record. The court has jurisdiction pursuant to 19 U.S.C.

---

[1]AHUG is the Plaintiff in Case no. 06-00229, which has been consolidated with the captioned matter.

§ 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).[2]  For the reasons

stated below, Commerce's determination is remanded.

## BACKGROUND

Tenex is the Russian executive agent responsible for the

export of uranium and uranium enrichment services from Russia.[3]

AHUG is a group of utility companies that use enriched uranium.[4]

---

[2]All references to the United States Code are to the 2000
edition.

[3]Enriched uranium fuel rods are used to generate nuclear
power.  The enrichment of uranium is a process by which the
concentration of U-235, an isotope of uranium, is increased from
its naturally occurring concentration.  Depending on the increase
in the concentration of U-235, the resulting uranium may be
considered low-enriched uranium ("LEU") or high-enriched uranium
("HEU").  LEU is appropriate for the production of nuclear
energy.  HEU is weapons-grade uranium, appropriate for nuclear
weapons.  For a more complete explanation of the generation of
nuclear energy, see USEC Inc. v. United States, 27 CIT 489, 491,
259 F. Supp. 2d 1310,314-16 (2003)("USEC I").  See also, USEC Inc.
v. United States, 27 CIT 1419, 281 F. Supp. 2d 1334 (2003) (USEC
II), aff'd in part Eurodif S.A. v. United States, 411 F.3d 1355
(Fed. Cir. 2005)("Eurodif I").

[4]In the Review, Commerce treated AHUG as an "industrial
user" of subject merchandise, pursuant to 19 C.F.R. § 351.312,
and did not recognize AHUG's standing as an "interested party."
Cf. USEC I, 27 CIT 489, 259 F. Supp. 2d 1310 (2003)(granting
interested party standing to AHUG members as possible "toll"
producers of subject merchandise), aff'd in part by Eurodif I,
411 F.3d 1355 (upholding as reasonable Commerce's determination
that domestic utilities were not foreign producers of uranium for
purposes of determining industry support of the petition).
Commerce's denial of "interested party" status did not reflect
any consideration of the nature of the transactions at issue
here.  Accordingly, Commerce's determination did not reflect
"consider[ation of] an important aspect of the problem," Motor
Vehicles Mfrs. Ass'n v. State Farm Mut., 463 U.S. 29, 43 (1983),
                                                    (continued...)

The Plaintiffs participated in Commerce's sunset review proceedings, the results of which are challenged here. Defendant-Intervenor, USEC, Inc., and its wholly-owned subsidiary, United States Enrichment Company (collectively, "USEC") is a domestic provider of enrichment services. USEC also participated in Commerce's sunset review.

Commerce conducts a five-year sunset review of a suspended antidumping duty investigation pursuant to Sections 751 and 752 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675.[5]

_____

[4](...continued)
and cannot be sustained. On remand, Commerce will have the opportunity to reconsider its position on this issue. Here, the government has moved to dismiss Case No. 06-229, claiming that AHUG lacks standing to bring its complaint. However, the court need not reach the standing issue as no party challenges Tenex's standing to challenge Commerce's determination.

[5]In relevant part, 19 U.S.C. § 1675(c) provides as follows: 5 years after the date of publication of-

(A) . . . a notice of suspension of an investigation, described in subsection (a)(1) . . . or
(C) a determination under this section to continue an order or suspension agreement,

the administering authority . . . shall conduct a review to determine, in accordance with section 1675a of this title, whether . . . termination of the investigation suspended under section 1671c or 1673c of this title would be likely to lead to continuation or recurrence of dumping . . . .

19 U.S.C. § 1675(c).

Further, 19 U.S.C. § 1675(d) provides, in relevant part, that:
[T]he administering authority shall . . . terminate a
(continued...)

The original suspended antidumping duty investigation reviewed
here was initiated in December of 1991, just before the dissolution
of the Soviet Union.[6]  Commerce continued the investigation against

---

[5](...continued)
suspended investigation, unless--
(A) the administering authority makes a determination that
dumping . . . would be likely to continue or recur . . . .

19 U.S.C. § 1675(d)(2).

Section 1675a in turn provides, in relevant part that:

(1) In general
In a review conducted under section 1675(c) of this title,
the administering authority shall determine whether . . .
termination of a suspended investigation . . . would be
likely to lead to continuation or recurrence of sales of the
subject merchandise at less than fair value. The
administering authority shall consider--

(A) the weighted average dumping margins determined in the
investigation and subsequent reviews, and

(B) the volume of imports of the subject merchandise for the
period before and the period after the issuance of the
antidumping duty order or acceptance of the suspension
agreement.

(2) Consideration of other factors

If good cause is shown, the administering authority shall
also consider such other price, cost, market, or economic
factors as it deems relevant.

(3) Magnitude of the margin of dumping

The administering authority shall provide to the Commission
the magnitude of the margin of dumping that is likely to
prevail if the order is revoked or the suspended
investigation is terminated.

19 U.S.C. § 1675a(c).

[6]The preliminary determination states the date of
dissolution of the Soviet Union as December 25, 1991. Uranium
(continued...)

the Soviet republics individually, as newly independent states, and, using best information available data, came to preliminary affirmative dumping determinations with regard to uranium products and services from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, and Uzbekistan.  <u>Uranium from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, and Uzbekistan</u>, 57 Fed. Reg. 23,380 (Dep't Commerce June 3, 1992)(preliminary determinations of sales at less than fair value).  However, before Commerce issued final results in that original investigation, the investigation was suspended, when the government entered into an agreement restricting the volume of imports to the United States. <u>Uranium from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, and Uzbekistan</u>, 57 Fed. Reg. 49,220 (Dep't Commerce Oct. 30, 1992)(suspension of investigations and amendment of preliminary determinations)("<u>Suspension Agreement</u>").[7]  As noted above, the action at issue here is a challenge to the results of the second five-year sunset review of the suspended investigation.

---

[6](...continued)
<u>from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, and Uzbekistan</u>, 57 Fed. Reg. 23,380 (Dep't Commerce June 3, 1992)(preliminary determinations of sales at less than fair value).

[7]Under the Suspension Agreement, uranium products and services are allowed to enter the U.S. when such products and services are bought and sold by USEC, pursuant to the Agreement between the Government of the United States of America and the Government of the Russian Federation Concerning the Disposition of Highly Enriched Uranium Extracted from Nuclear Weapons ("HEU Agreement") and the USEC Privatization Act, 42 U.S.C. § 2297h.

In this matter, both Tenex and AHUG challenge Commerce's scope

determination in the Review and its finding of a likelihood of

continued or recurring dumping if the Suspension Agreement is

terminated, together with other subsidiary findings upon which

Commerce's decision is based.  Specifically, Plaintiffs challenge

Commerce's inclusion of low-enriched uranium (LEU) obtained

pursuant to uranium enrichment services contracts both in the scope

of the Review and in the "likelihood" determination.[8]  In addition,

---

[8]Enrichment services contracts have been examined in <u>USEC I</u>,
<u>USEC II</u> and <u>Eurodif I</u> <u>reaff'd</u> 423 F.3d 1275 (Fed. Cir.
2005)("<u>Eurodif II</u>"), <u>aff'd</u> <u>per curiam</u> 217 F. App'x 963 (Fed. Cir.
2007).  Typically, these contracts are structured so that a
utility contracts for the enrichment of a certain amount of
converted uranium (called "feedstock"), which it supplies.  The
enricher provides enriched uranium to the utility, in exchange
for a comparable amount of feedstock and payment for the amount
of separative work units ("SWU") necessary to enrich the
feedstock.  Although the enriched uranium is typically not the
same uranium as the feed uranium provided for a given
transaction, it is contractually treated as such.  These
contracts or transactions are referred to as "SWU contracts" or
"SWU transactions."
    Commerce defined "SWU transactions" in <u>Low Enriched Uranium</u>
<u>from Fance, final Results of Redetermination Pursuant to Court</u>
<u>Remand, Eurodif S.A. v. United States</u>, (Dep't of Commerce, June
19,2006) ("Also excluded from the scope of this order is LEU
produced and imported pursuant to a separative work unit ("SWU")
transaction. For purposes of this exclusion, a SWU transaction
means a transaction in which the parties only contract for the
provision of enrichment processing, and the purchasing party is
responsible for the provision of natural uranium feedstock to the
enricher. At no time, before, during or after enrichment, does
the enricher own or hold title to the LEU product delivered under
the contract. In order to qualify for the exclusion,
the SWU transaction must be performed in accordance with the
relevant terms of a written contract for the provision of SWU.
Entries pursuant to such SWU transactions must be accompanied by
the certification of the end user and enricher." <u>Available at</u>
                                              (continued...)

Tenex alleges that if Commerce's decision is interpreted as having made the statutorily required finding of a likelihood of dumping if the investigation were terminated, in accordance with 19 U.S.C. §§ 1675(c) and 1675a(c), then such a determination was neither in accordance with law nor supported by substantial evidence because, inter alia, the determination failed to exclude SWU transactions.

Lastly, Tenex challenges as unsupported by substantial evidence Commerce's reliance upon the 115.82% margin set in Commerce's original preliminary determination, and adopted in the Final Results here as the margin likely to prevail in and after the Review.  This last challenge, according to Tenex, is based on the alleged "extraordinary circumstances" that have occurred since the commencement of the investigation and preliminary determination, such as the decline of the Soviet Union and Russia's emerging status as a market economy country,[9] exacerbated by the fact that

_____

[8](...continued)
http://ia.ita.doc.gov/remands/06-75.pdf)
     Pursuant to the HEU Agreement, USEC is the U.S. Executive Agent authorized to sell SWU obtained from Russia on the U.S. market.  (USEC also has enrichment facilities of its own in the United States).  The SWU Russia sells, through its executive agent, Tenex, is inherent in LEU which Tenex prepared by downblending high enriched, weapons-grade uranium: HEU.

     [9]Plaintiffs noted that Commerce recognized Russia as a market economy on April 1, 2002. Mem. from Albert Hsu, Senior Economist, to Faryar Shirzad, Assistant Secretary, Import Administration Re: Inquiry into the Status of the Russian Federation as a Non-Market Economy Country Under the U.S. Antidumping Law (June 6, 2002) available at http://ia.ita.doc.gov
                                                      (continued...)

in the preliminary determination, Commerce relied upon the "best information available" in making its determination.  Tenex argues that Commerce, in conducting its sunset review, should not rely on USSR information but rather should look to Russia-specific information and take into account the changed economy of the country as well.  In addition, Tenex challenges the connection between Commerce's finding that prices were likely to be depressed if the Suspension Agreement was lifted and its conclusion that uranium would be sold at less than fair value, noting that there is no necessary, logical connection between prices which may be low and prices which are less than normal value and therefore constitute dumping.

STANDARD OF REVIEW

The court will uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

It is settled law that LEU processed pursuant to uranium enrichment services transactions is not a "good" or "merchandise" subject to the antidumping duty statute and that such transactions

---

[9](...continued)
/download/russia-nme-status/russia-nme-decision-final.htm.

do not constitute a "sale" subject to those statutory provisions. See 19 U.S.C. § 1673;[10] see also, Eurodif I, 411 F.3d 1355; Eurodif II, 423 F.3d 1275. The Federal Circuit's holdings were based primarily on the utilities' retention, in a SWU transaction, of ownership of the uranium. Eurodif I, 411 F.3d at 1362 (explaining that "the utility retains title to the quantity of unenriched uranium that is [sic] supplies to the enricher. The utility's title to that uranium is only extinguished upon the receipt of title in the LEU for which it contracted."). The utility thus maintains title to its feed uranium until it receives the enriched uranium, at which time it pays for the SWU necessary to enrich the relevant amount of feed uranium into the LEU it receives. As a result, there is no "transfer of ownership," as required for a sale, because the utility has ownership of the relevant uranium at all times during the transaction. Id. citing NSK Ltd. v. United States, 115 F.3d 965 (Fed. Cir. 1997). The court in Eurodif I also pointed to the "fundamental purpose" of the transaction, which was "the provision of enrichment services" as opposed to the sale of enriched uranium. Eurodif I, 411 F.3d at 1362-63. In Eurodif II, the court clarified its earlier holding "by stating expressly that

---

[10]That section reads in relevant part: "[i]f . . . the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value . . . then there shall be imposed upon such merchandise an antidumping duty . . . ." 19 U.S.C. § 1673 (emphasis added).

the antidumping duty statute unambiguously applies to the sale of goods and not services" and that "Commerce's characterization of the SWU contracts [as contracts for the sale of goods] . . . would contradict . . . the statute's unambiguous meaning because it is clear that those contracts are contracts for services and not goods." Eurodif II, 423 F.3d at 1278.

As a result of these holdings, the Federal Circuit has determined that Commerce's claim that LEU produced as a result of SWU contracts or transactions is subject to antidumping duties is not in accordance with law. Id. Together, Eurodif I and Eurodif II make it clear that contracts for enrichment services are contracts for services, not goods, and that as such, they are not subject to the antidumping laws.[11]  See also Eurodif S.A. v. United States,

---

[11]Although the USEC Privatization Act of 1996 post-dates the original Suspension Agreement at issue here, it seems clear to the court that Congress, in that 1996 Act, intended that future transactions in enriched Russian uranium be limited to transactions structured as SWU transactions. See 42 U.S.C. § 2297h-10(b)(3) (permitting only transactions where equivalent amounts of feed uranium are exchanged by the contracting parties, with the result that the "purchase" would be of SWU for any deliveries of enriched uranium on or after January 1, 1997).  It is also clear that Congress was intentionally differentiating between sales that included feed uranium, see, e.g., 42 U.S.C. §§ 2297h-10(b)(1), (2)(mandating that prior to December 31, 1996, the U.S. Executive Agent transfer without charge title to the natural uranium component of LEU obtained pursuant to the HEU Agreement to the Secretary of Energy to sell, and that such uranium would be considered of Russian origin) and sales that were only to be for SWU, 42 U.S.C. § 2297h-10(b)(3) (dictating that the equivalent amount of U.S. origin feed uranium transferred by USEC to the Russian executive agent was to be
(continued...)

Appeal No. 2007-1005-1006 at 4 (Fed. Cir. Sept. 21, 2007)(identifying the "SWU contract exception" established by Eurodif I and Eurodif II).

In the Review at issue here, Commerce continued to include, within the scope of the investigation, LEU obtained pursuant to enrichment services transactions. Commerce also made a determination that there was a likelihood of continued or recurring dumping, based at least in part on data that included SWU transactions.

Commerce defended its scope position in the Review, in part, by claiming that the Eurodif "litigation . . . has not been completed, and [Commerce] is continuing to actively pursue all avenues in the litigation process . . . [t]herefore, this litigation has no effect on the Suspension Agreement or this sunset review," and by asserting that it would follow its policy not to "evaluate scope issues or revise the scope of a proceeding in the context of a sunset review." Decision Mem. at 14-15 (Cmt. 2), citing Uranium from Russia, 65 Fed. Reg. 41,439 (Dep't Commerce July 5, 2000)(final results of full sunset review of suspended

---

[11](...continued)
considered Russian in origin), thereby setting up, for sales going forward, the same "legal fiction" defined by the Eurodif cases as SWU transactions. As such, it is not clear to the court how Commerce can continue to argue that these transactions can be subject to the antidumping statutes.

antidumping duty investigation) and the accompanying Issues & Decision Mem. (Cmt. 1)(noting that a scope determination was currently before Commerce, and that it was "not appropriate to evaluate scope issues or revise the scope language in the course of this sunset proceeding."). Commerce further determined that because the Eurodif I and Eurodif II decisions covered an investigation with a scope that was limited to LEU, the decisions were not necessarily applicable to the investigation at hand, which covered LEU in addition to other uranium products. Id.

Plaintiffs argue that Commerce is bound by stare decisis to follow the binding precedent in the Eurodif cases by excluding SWU transactions from the scope of the investigation. See Pl.'s Mot. J. Agency R., Court No. 06-00228 at 12-14 ("Tenex Br."); see also Initial Br. of Ad Hoc Utilities Group in Supp. R. 56.2 Mot. J. Agency R., Court No. 06-00229 at 19-20 ("AHUG Br."). AHUG further argues that Commerce cannot decline to follow precedent based on its "policy" of not reviewing scope determinations during a sunset review, because ignoring controlling law (here, the Eurodif cases) is not acting in accordance with law. AHUG Br. 21-22, citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). Tenex also argues that Commerce must depart from its policy where, as here, the policy is in conflict with Commerce's obligation to comply with the law. Tenex Br. 13-14. Plaintiffs further note that although the scope of the review

in this action is broader than that in the Eurodif cases, in that
it covers uranium other than LEU, the Eurodif holdings were not
limited to LEU.  Rather, the Eurodif cases are applicable to all
transactions pursuant to SWU contracts, and stand for the
proposition that those transactions are not subject to antidumping
duty law.  Tenex Br. at 16; AHUG Br. at 21.  Thus, Plaintiffs
contend--correctly--that the Eurodif cases are both controlling and
applicable here.

Commerce's inclusion of uranium enrichment services in the
scope of the review at issue here also undermines its decision with
regard to the likelihood of continued or recurring dumping.  During
the sunset review, Commerce stated its conclusion that there was a
likelihood of continued or recurring dumping of uranium products
from the countries of the former Soviet Union on the American
market.  In making this statement, Commerce relied on uranium
enrichment services transactions in addition to the importation of
goods, stating that "absent the Suspension Agreement, imports of
Russian uranium and SWU would likely undercut and depress or
suppress U.S. market prices for uranium products." Decision Mem. at
8 (Cmt. 1)(emphasis added).  Plaintiffs argue that SWU transactions
cannot be included in the determination of recurrence of dumping,
as such transactions are not subject to the antidumping laws.
Tenex Br. at 14-15; AHUG Br. at 28-30.

The government has indicated that it does not oppose a remand to exclude from the scope of its review LEU obtained pursuant to uranium enrichment services contracts, and to redetermine the likelihood of future dumping, again excluding from its findings LEU that will be obtained pursuant to enrichment services transactions. See Restated Mot. to Dismiss No. 06-00229 & Response to Pls.' Mots. for J. Upon the Admin. R. 14 (consenting to a remand to implement the Eurodif cases because "Commerce based its determination upon an analysis of the domestic and world market in uranium in all forms, including sales of SWU." (emphasis added))("Def.'s Br.").[12]

The government's consent to remand is well-founded because Commerce must abide by the Eurodif decisions in both its scope determination and its determination of the likelihood of continued or recurring dumping.  The court will therefore remand the matter to Commerce for a determination of the correct scope of the investigation, excluding all sales pursuant to enrichment services transactions, as outlined in the Eurodif cases, and a re-

---

[12]Citing 19 U.S.C. § 1675(d)(2)("the administering authority shall . . . terminate a suspended investigation, unless . . . [it] makes a determination that dumping . . . would be likely to continue or recur"), Tenex opposes remand, asking that the court instead order Commerce to terminate the investigation.  Tenex argues that it is futile to expect Commerce to now engage in the statutorily required analysis. The court notes that Commerce has yet to articulate, in its uranium cases, a coherent interpretation of the statutes that is consistent with its interpretations in other industries or contexts.  Nonetheless, as Commerce has consented to remand, the court will not, at this stage, conclude that the futility standard has been met.

determination of the likelihood of continued or recurring dumping without reliance on such transactions.

Plaintiffs also argue that Commerce's reliance on information from the original, preliminary determination in the antidumping investigation renders Commerce's final determination unsupported by substantial evidence because of the extraordinary changes in circumstance since the time of the original determination. Tenex Br. 28, citing Government of Uzbekistan v. United States, 25 CIT 1084 (2001)(remanding sunset review results to Commerce to gather new data and make new findings of dumping margin, because using best information available was inappropriate given the extraordinary circumstances of the dissolution of the U.S.S.R.). These issues were raised by Tenex during the Review. The government has not responded to this argument.

As noted above, Commerce is charged with making a likelihood determination that is in accordance with law. 19 U.S.C. § 1675(c). It has not done so here, and it therefore must do so on remand. The requirement that Commerce follow the precedent by which it is bound, articulated in the Eurodif cases, will necessitate a reconsideration of relevant economic factors, in accordance with 19 U.S.C. § 1675a(c)(directing Commerce to consider other relevant factors where the record provides an appropriate, "good cause" basis for it to do so). Therefore, on remand, in reassessing the

likelihood of continued dumping, Commerce must necessarily examine
economic and political changes that have occurred since the
preliminary determination, such as the dissolution of the Union of
Soviet Socialist Republics and Russia's change of status to a
market economy, and determine whether these changes affect the
reevaluation of the likelihood of continued or recurring dumping.
See Government of Uzbekistan v. United States, 25 CIT 1084, 1088
(2001)("As a threshold matter, Commerce must support its finding of
a non-de minimus margin before it can embark on a rational
§ 1675(c) analysis.")

In addition to arguments relating to the Eurodif cases and
market and political changes in Russia, Tenex challenges Commerce's
conclusion that there is a likelihood of continued or recurring
dumping as not logically connected to its factual findings.
Specifically, Tenex argues that Commerce never found that sales of
subject merchandise would be at less than fair value, as required
by 19 U.S.C. § 1675a(c).[13]  Tenex Br. at 20.  Rather, Tenex claims
that the determination at most finds that there would be greater
imports from Russia which would lower U.S. market prices for
uranium products, but that lower prices do not necessitate a
finding that dumping has occurred.  Tenex Br. at 20-21, citing
Decision Mem. at 6-9.  Commerce describes this argument by Tenex as

---

[13]Supra, n.5.

being based on "economic factors," and argues that it is barred by
the exhaustion doctrine. Def.'s Br. at 15-16.  However, Tenex is
challenging the conclusion drawn by Commerce (the likelihood of
continued dumping) as not supported by the actual findings
(likelihood of price depression and of some "margin" likely to
prevail).[14]  Thus, in this argument, Tenex is not merely challenging
the specific price data used, or a specific finding made,[15] but
rather both the analysis followed and the conclusion drawn.  This
challenge is in contrast to those in the cases the government cites
to support its proposition that the court should here exercise its
discretion to "require the exhaustion of administrative remedies,"
as those cases generally involved the challenge of a specific
economic factor,[16] or are otherwise not applicable.[17]

---

[14]In addition to finding the price would be driven down,
Decision Mem. at 8-9 (Cmt. 1), Commerce found a margin of
115.82%, Decision Mem. at 21-23 (Cmt. 3), but never connected the
two findings.

[15]Although Tenex does challenge the findings on various
grounds.

[16]Zhejiang Machinery Imp. & Exp. v. United States, Slip-Op.
07-15, 473 F. Supp. 2d 1365 (2007)(exporter failed to exhaust its
administrative remedies available and therefore could not
challenge use of Indian surrogate values for scrap because it did
not raise such issue in underlying administrative proceeding nor
include it in the complaint); Carpenter Technology Corp. v.
United States, 30 CIT __, 452 F. Supp. 2d 1344 (2006)(court
exercised its discretion to dismiss for a failure to exhaust
administrative remedies, noting that plaintiff's failure to
challenge Commerce's decision to collapse entities resulted in a
lack of administrative record to review in addition to not
allowing Commerce to consider plaintiff's arguments in the first
                                                (continued...)

In the Review at issue here, Commerce's finding of likelihood
of continued or recurring dumping was challenged on various grounds
by both Tenex and AHUG.  Tenex argued that the inclusion of SWU
transactions in its data was unlawful, that Russia's status as a
market economy, no longer part of the U.S.S.R., warranted the use
of different data, and that changes in the Russian uranium industry
and the global market for uranium warranted a broader analysis.  In
addition, AHUG also argued that Russia's status as a market
economy, no longer part of the U.S.S.R., warranted a use of
different data.  Commerce was thus given the opportunity to develop
a record in order to address its ultimate finding that dumping was
likely to occur or continue.[18]  Tenex claims that those findings,
however, simply do not support the conclusion Commerce has drawn.
While Tenex disputed these issues in the context of the magnitude

---

[16](...continued)
instance); Ta Chen Stainless Steel Pipe, Ltd. v. United States,
28 CIT __, 342 F. Supp. 2d 1191 (2004)(plaintiff failed to
exhaust administrative remedies by not challenging denial of
offset adjustment before Commerce).

[17]Sharp Corp. v. United States, 837 F.2d 1058 (Fed. Cir.
1988)(court found it was unnecessary to reach the question of
exhaustion); JCM, Ltd. v. United States, 210 F.3d 1357, 1359
(Fed. Cir. 1999)(dismissal was based on lack of jurisdiction
under 28 U.S.C. 1581(i) because Plaintiff had failed to exhaust
administrative remedies available under other sections, having
not participated in challenge before Commerce).

[18] Accordingly, there can be no claim that Commerce did not
have the opportunity to develop a record with respect to
determining the likelihood of dumping, or to use its expertise.
Cf., e.g., Carpenter Technology Corp. v. United States, 30 CIT at
__, 452 F. Supp. 2d at 1346.

of the margin likely to prevail, rather than in the finding of
likelihood of recurrence or continuation of dumping, Tenex did
challenge the likelihood finding at the administrative level, and
properly sought administrative relief from the result it felt was
improperly reached by the agency. See, Techsnabexport Case Brief in
response to Uranium from the Russian Federation, 71 Fed. Reg. 16,
560 (Dep't Commerce Apr. 3, 2006)(preliminary results) and
accompanying Issues and Decision Mem., P.R. Doc. 38 at 2 (Cmt.
1)("[Commerce's] failure to acknowledge the [Court of Appeals for
the Federal Circuit's] Eurodif rulings invalidates any of
[Commerce's] findings regarding . . . the likelihood of dumping and
effect on U.S. market prices . . . .").  As Tenex notes,
determining whether dumping is likely to recur is precisely what
Commerce was doing during this sunset review.  Pl.'s Reply Br.
Supp. R. 56.2 Mot. J. Agency R., Court No. 06-00228 at 11 ("[t]he
issue is the basic statutory obligation in a sunset review to make
a determination of dumping that should be and is crystal clear").
Accordingly, Tenex has not failed to exhaust its administrative
remedies with regard to its claim that Commerce failed to make a
finding regarding future sales, future margins, and the likelihood
of continued dumping.

     Although the court may, in its discretion, hear this argument,
it need not reach the issue today.  On remand, Commerce will be
reexamining data relating to the likelihood of continued or

recurring dumping, and the margin likely to prevail.  In that context, it will have the opportunity to further examine whether its findings support its ultimate conclusion.


### Conclusion


For the foregoing reasons, the court **remands** Commerce's determination, for re-determination in accordance with this opinion, and **denies** Plaintiffs' Motions for Judgment on the Agency Record.

Remand results are due by November 26.  Comments are due by December 17.  Reply comments are due by December 27.  SO ORDERED.


/s/ Donald C. Pogue

Donald C. Pogue, Judge


Dated:    September 26, 2007

New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____          By: _____
                                              Deputy Clerk